FILED
2007 Sep-06  AM 11:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| EVANSTON INSURANCE CO., | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | 2:05-cv-743-JHH |
| PROFESSIONAL UNDERWRITERS | ) | |
| LIABILITY INSURANCE CO., | | |
| | ) | |
| DEFENDANT. | | |

## MEMORANDUM OF DECISION

The court has before it two motions for summary judgment.  Defendant Professional Underwriters Liability Insurance Company (PULIC) filed a motion (doc. #30) for summary judgment on May 22, 2007.  That same day, plaintiff Evanston Insurance Company also filed a motion (doc. #31) for summary judgment.  Pursuant to the court's May 23, 2007 order, the motions were deemed submitted, without oral argument, on June 20, 2007.

## I. Procedural History

Evanston commenced this action on April 8, 2005 by filing a complaint in this court "seeking contribution from the defendant insurer."  (Compl. at 1.)  The case arises out of the settlement of a complaint filed in Bullock County, Alabama

by a nursing home patient who developed bedsores that were improperly treated by the nursing home over a period of months, and which ultimately worsened to such an extent that the patient's leg was amputated.  (See Bullock County Compl.) During the course of treatment, the nursing home's insurance carrier changed from PULIC to Evanston.  Although both shared the cost of defending the lawsuit, only Evanston ultimately settled with the patient.  The instant complaint by Evanston seeks reimbursement from PULIC for that settlement.  PULIC and Evanston both filed motions for summary judgment, asserting that no genuine issue of material fact exists and that each is entitled to judgment as a matter of law.

The parties have filed briefs and submitted evidence in support of their respective positions.  Defendant submitted a brief and evidence[1] (doc. # 30) in support of its own motion for summary judgment on May 22, 2007.   That same day, plaintiff filed a brief (doc. # 32) and evidence[2] (doc. # 34) in support of its motion for summary judgment.  On May 30, 2007 and May 31, 2007, plaintiff

---

[1] The defendant submitted the following evidence: Jan. 25, 2002 complaint filed by Mary Glaze in Bullock County, Alabama; the Evanston Insurance Company policy; excerpts from the deposition of Kathleen Johnson; and The Doctors Company policy issued to Southern Springs Healthcare.

[2] The plaintiff submitted the following evidence: declaration of Kathleen Johnson; declaration of W. Hill Sewell with attached exhibits A-D; deposition of Nine LaVenia with attached exhibits 1-14.

filed a restated brief (doc. #35) and a final, corrected brief (doc. #36) in support of its motion for summary judgment.  On June 13, 2007, defendant filed a brief (does. #37) in opposition to plaintiffs's motion for summary judgment, and plaintiff filed a brief (doc. #39) in opposition to defendant's motion for summary judgment.  On June 20, 2007, plaintiff filed a brief (doc. #40) in reply to defendant's opposition and, likewise, defendant filed a brief (doc. # 42) in reply to plaintiff's opposition.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there

3

is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

4

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. See Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict

5

motion at trial based on the alleged evidentiary deficiency.  However, when

responding, the non-movant can no longer rest on mere allegations, but must set

forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996)

(citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant[3] Undisputed Facts[4]

---

[3] The court is not  limited to the allegations contained in the underlying complaint filed in Bullock County, Alabama, in determining the present coverage issue.  Under Alabama law, the determination of whether the policy extends coverage to liability of the insured arising from any particular instance depends on whether the actual facts of the occurrence fit within the policy's coverage.  Tanner v. State Farm Fire & Cas. Co., 874 So.2d 1058, 1068 (Ala. 2003) (citations omitted); United States Fid. & Guar. Co. v. Armstrong, 479 So.2d 1164, 1164 (Ala. 1985).

Additionally, on December 22, 2006, the court ordered the parties to "develop for the court the agreed and disputed relevant facts" because the parties agreed at the pretrial conference that "few, if any, relevant facts were in dispute." (Doc. #22.)  The court established a procedure by which the facts would be submitted to the court, stating that "[i]n indicating disagreement with a proposed fact, counsel shall do so by deletion or interlineation of particular words and phrases so that the nature of the disagreement will be clear."  (Id.)  PULIC ignored this portion of the order by the court, and unilaterally decided "not [to] alter any fact proposed by the plaintiff," to which it did not agree, but made a general statement of "disagree[ment] with the materiality or relevancy of a significant number of facts proposed by the plaintiff." (Doc. #29.)  PULIC further stated, however, that it did  "not necessarily disagree with the actual version of events represented by any particular fact proposed by the plaintiff in every instance."  (Id.)

The court is at a loss as to which facts proposed by Evanston that PULIC agrees and disagrees.  Although PULIC limited its specific agreement of facts to the allegations contained in the underlying complaint, the court has already concluded that it is not limited to those facts.  Although the court will not take the step encouraged by Evanston and deem each fact not specifically denied as admitted, the court will consider the evidence presented by plaintiff in support of its statement of facts, and notes that defendant has not presented any evidence to the contrary.  The court remains mindful, however, of its obligation not  to consider immaterial evidence, irrelevant evidence, and other evidence that could not be reduced to admissible form at trial.  See Macuba v. Deboer, 193 F.3d 1316, 1322-23 (11th Cir. 1999).

[4] Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S., 224 F.2d 338, 345 (5th Cir.

### A.  The Facts Underlying the Bullock County Lawsuit

On July 27, 1999, Mary Glaze was admitted to Southern Springs, a nursing home in Bullock County, Alabama.  (Ex. A to Sewell Decl., Admission Nursing Evaluation.)  When admitted, Glaze was 75 years old, wheelchair bound, and suffered from "multiple infected sores,"[5] non-insulin dependent diabetes, dementia, paralysis on the right side due to an earlier stroke, and contracted muscles on her ride side, among other things.  (Id.; OBRA Level I Determination.)  She could not control her bladder or her bowels.  (Admission Nursing Evaluation at 2.)  The admitting nurse noted that Glaze required assistance with activities of daily living and was noted to need the side rails to be up on her bed at all times, both for safety and to assist in turning.  (Id.)  Although the nurse noted lesions on Glaze's skin, no decubitus ulcers were identified.  (Id.)

From mid-August 1999, until February 2000, Glaze developed decubitus

---

1955); Matter of Lanting, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996).  The court will consider each motion independently, and in accordance with the Rule 56 standard.  See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit."  See WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 327-28 (3d ed. 1998).

[5] These infected sores were apparently infect insect bites, rather than pressure sores.  (See Ex. 1 to La Venia Depo.)

ulcers,[6] which led to necrotic areas on the left foot.  (<u>See</u> Ex. A to Sewell Decl.)
On February 10, 2000, Glaze was admitted[7] into the hospital where she remained
until February 18, 2000.  (<u>Id.</u>)  On February 23, 2000, a physician recommended
an above-the-knee amputation of Glaze's left leg, which was performed on March
2, 2000.  (<u>Id.</u>)

## B.  The Insurance Policies

PULIC insured Southern Springs under a "professional incident coverage"
policy that began on October 15, 1999 and ended on February 7, 2000 at 12:01
a.m.  (Ex. D to Doc. #30, PULIC policy.)  The PULIC policy period covered
"professional incidents" occurring up to February 7, 2000 at 12:01 a.m.  (<u>Id.</u>)  A
"professional incident" is defined in the PULIC policy as "any act or omission in
the furnishing or failure to furnish professional services . . . ."  (<u>Id.</u>)  The
"professional incident" coverage trigger states that PULIC "will pay those sums
that the insured becomes legally obligated to pay as damages because of a
'professional incident' in the course of performing professional services. . . ."

---

[6] Decubitus ulcers are ulcers "caused by prolonged pressure in a patient allowed to lie too
still in bed for a long period of time."  <u>Dorland's Illustrated Medical Dictionary</u>, 1771 (28th ed.
1994).

[7] Upon admission to the hospital the emergency room report noted "left foot drainage
yellowish discharge with foul smelling odor.  Pedal pulses absent bilaterally.  Sores on foot were
swabbed for cultures and sent to the lab."  (Ex. B to Sewell Decl.)  The lab results were positive
for staff infection, and she was given antibiotics.  (<u>Id.</u>)

8

(Id.)  The PULIC policy limit was one million dollars per incident.  (Id.)

The PULIC policy contains an "other insurance" clause, stating that "[i]f other valid and collectible insurance is available to the insured for a loss we cover . . . "t]his insurance is primary, except as stated . . . below."[8]  (Id.)  In addition, the PULIC policy contains a clause entitled "method of sharing" which sets out its "pro rata" other insurance clauses.  Specifically, the policy states that "[i]f all of the other insurance permits contribution by equal shares, we will follow this method also.  Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance, or none of the loss remains, whichever comes first."  (Id.)  However, the clause further states that "[i]f any of the other insurance does not permit contribution by equal shares, we will contribute by limits.  Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of all insurers."  (Id.)

Evanston Insurance Company provided coverage to Southern Springs under a "claims-made" liability insurance policy, which means that Evanston covered the nursing home for claims made during the policy period.  (Ex. B to Doc. #30, Evanston Policy.)  The Evanston policy period was from February 7, 2000 until

---

[8] The exception relates to excess insurance applicable only to personal policies of employees and students and is not at issue here.

February 7, 2001 at 12:01 a.m., and covered claims that relate to "malpractice committed or alleged to have been committed subsequent to" February 7, 2000. (Id.)  The policy limit was $500,000 per claim.  (Id.)  The policy contains an "other insurance" clause, which provided that the insurance was "in excess of the amount of the applicable deductible and any other valid and collectible insurance available to the insured . . . unless such other insurance is written only as specific excess insurance . . . ."  (Id.)

### C.  The Bullock County Lawsuit

Glaze filed a malpractice suit on January 25, 2002.  (Ex. C to Doc. #30). Her complaint alleged that because the nursing home negligently failed to rotate and move the partially paralyzed Glaze, she developed bedsores that became seriously infected, and ultimately resulting in the amputation of her left leg.  (Id.) More specifically, the complaint and amended complaint[9] alleged that

> Beginning in February, 2000, the Defendants and their staff, including nurses, doctors, orderlies and aids, had stopped routinely changing Mary Glaze's body position so as to avoid the development of pressure sores and poor circulation. . . .  By, no earlier than, February 1, 2000, Mary Glaze had developed pressure sores and poor circulation which ultimately led to the amputation of her left leg. . . . The amputation of Mary Glaze's leg and her severe pressure sores were a direct and proximate consequence of the following acts of

---

[9] The complaint was amended on October 30, 2002.  (See Ex. E to Doc. #29, Amended Compl.)

10

medical negligence:
  (a)   Failure to monitor [Glaze]'s condition.
  (b)   Failure to rotate [Glaze]'s body.
  (c)   Failure to assist and help [Glaze] ambulate so as to improve her
        circulation.
  (d)   Failure to treat [Glaze]'s poor circulation and bed sores.
  (e)   Failure to properly diagnose [Glaze]'s condition by failing to
        adequately care and treat her bed sores and poor circulation.
  (f)   Failure to change [Glaze]'s clothing and bedding resulting in
        her sleeping in soiled clothing and bedding and clothing which
        smelled of urine and feces.
  (g)   Failure to move and reposition [Glaze] so as to improve her
        circulation and decrease the likelihood of development of
        pressure sores.

(Id.; see also Ex. E to Doc. #29, Amended Compl.)

PULIC first received a copy of the complaint on February 4 or 5, 2002.  (Ex.

1 to LaVenia Dep.)  PULIC faxed a copy of the complaint to Evanston on

February 13, 2002.  (Id.)  The carriers agreed to evenly split the cost of the

defense, and upon the recommendation of Southern Springs and others, retained

Hill Sewell of Johnston Barton to defend.  (Id.)

Both insurance companies began separate evaluations of the complaint.   By

late summer 2002, settlement negotiations began between Evanston and Glaze.[10]

(Ex. D to Sewell Decl.) Although advised of the settlement negotiations, PULIC

----

[10] Apparently Glaze's attorney was not aware of the PULIC policy.  Although plaintiff's
brief represents that "[p]rior to the execution of the settlement, [Glaze's attorney] was advised of
the PULIC policy" by Evanston, it is unclear when this actually occurred.

11

refused to participate because of a mistaken belief that it needed consent of the insured to settle.  (See LaVenia Dep. at 20; Ex. 1 to LaVenia Dep at 63.)  Glaze's attorney demanded $460,000 to settle the case.  (Ex. 1 to LaVenia Dep at TDC67-68.)

Over the next months, talk continued between Evanston and PULIC regarding settlement.  PULIC continued to refuse because of its mistaken belief that the policy contained an insured's consent clause.  Finally, in May, 2003, Evanston demanded that PULIC participate in the settlement of the claim or Evanston would settle at $460,000 and sue PULIC for contribution.  (Ex. 8 to LaVenia Dep.)  PULIC maintained its position and refused to participate in the settlement for lack of insured consent.  (Ex. 1 to LaVenia Dep. at TDC 7-8.)

Then, on May 12, 2003, PULIC requested consent of Southern Springs.  On May 16, 2003, Southern Springs expressly gave consent to settle with Glaze, which was received by PULIC on May 19, 2003.  (Exs. 2,4 to LaVenia Dep; LaVenia Dep. at 36.)  PULIC, however, did not make any settlement offer, but complained that it had been shut out of negotiations.  (Ex. 1 to La Venia Dep. at TDC 1, 2.)  After much back and forth between the insurance companies and attorneys representing the insurance companies, and with no agreement reached (see Exs. 1,5 to Lavenia Dep.; Ex. 3 to Johnson Dep.; LaVenia Dep. at 21),

12

Evanston settled the Glaze lawsuit on May 23, 2003, for $460,000.  (Ex. D to

Sewell Decl.)  As promised, the instant complaint was filed by Evanston on April

8, 2005, seeking contribution from PULIC.  (See Compl.)

## IV. Applicable Substantive Law and Analysis

The basic nature of this case is not uncommon: two insurance companies are

fighting over which company is liable for the damages paid on behalf of the

insured, or whether both are liable.  The problem with this case, however, is that it

does not involve a single, defined event, such as an automobile crash or a house

fire.  Instead, it involves bedsores that progressively developed and went without

proper treatment over a period of time.  And during that period of time, the nursing

home was insured by two separate insurance companies.  It is now the court's

unenviable position to decide whether, and if so, how, to allocate the settlement

paid by one of the two insurance companies.[11]

---

[11] At the outset, the court rejects PULIC's argument that the Glaze complaint was insufficient to state a claim against Southern Springs under the Alabama Medical Liability Act (AMLA).  The facts alleged in the amended complaint in Glaze are more specific than allegations held to be sufficient by the Alabama Supreme Court.  See, e.g., Ex Parte Coosa Valley Health Care, Inc., 789 So.2d 208, 210-16 (Ala. 2000);  Ex Parte McCollough, 747 So.2d 887, 888-89 (Ala. 1999); Mikkelsen v. Salama, 619 So.2d 1382 (Ala. 1993); Baptist Med. Ctr. Montclair v. Wilson, 618 So.2d 1335 (Ala. 1993).  Moreover, even if the complaint was insufficient, Alabama courts almost always afford plaintiffs the opportunity for discovery and amendment before a dismissal.  See Champ Lyons, Alabama Rules of Civil Procedure Annotated 243 (3d ed. 1996).

### A. Did Evanston and PULIC Insure the Same Risk?

The first question that must be decided is whether Evanston and PULIC insured the same risk.  "It is well established . . . that if an insurer has paid the entire amount of a loss, that insurer may seek contribution from other insurers liable for the same risk . . . .  This right to contribution is based on the principle that the paying insurer paid a debt owed by another, concurrently liable insurer."  Nationwide Mutual Ins. Co. v. Hall, 643 So. 2d 551, 561-62 (Ala. 1994) (citations and emphasis omitted).  Both parties agree that Nationwide provides "the legal basis upon which one insurer has a right to contribution or indemnity against a co-insurer having common obligations."  (Def. Opp. Br. at 3.)  Where the parties split is how whether Evanston and PULIC insured the same risk.  PULIC contends that the companies did not insure the same risk because the policies were consecutive, and not concurrent.  Evanston contends, however, that they did cover the same risk because of the commonality of the concurrent obligation regarding Southern Home's exposure in the Glaze lawsuit.

The court begins, where it must, with the insurance contracts.  Although the policies are consecutive in time, the language of the policies clearly shows that both policies insured Southern Home for its exposure for Glaze's injuries.  PULIC insured Southern Home for "professional incidents," defined as "[a]ny act or

14

omission in the furnishing or failure to furnish professional services," occurring between October 15, 1999 and February 7, 2000 at 12:01 a.m.  Importantly, there is no limitation in the PULIC policy regarding the date of injury, damage, manifestation of the injury, or discovery of the injury.  The Evanston policy, a "claims-made" policy, picked up after the PULIC policy terminated.  The Evanston policy covered claims relating to "malpractice committed or alleged to have been committed subsequent to" February 7, 2000 and terminated on February 7, 2001 at 12:01 a.m.

The undisputed evidence in the record clearly shows that "professional incidents," as defined by the PULIC policy, occurred during the PULIC policy period which ended on February 7, 2000 at 12:01 a.m.  For instance, although Glaze was admitted to the nursing home without any decubitus ulcers in late July 1999, by February 7, 2000, stage II decubitus ulcers had developed on Glaze's left foot and ankle and a pedal pulse could not be located on the left foot on that day.  Stage II decubitus ulcers do not form overnight, but are "caused by prolonged pressure in a patient allowed to lie too still in bed for a long period of time."  See Dorland's Illustrated Medical Dictionary, 1771 (28th ed. 1994).  The ulcers, therefore, were present, and not treated properly, before the expiration of the PULIC policy, and those ulcers eventually led to the amputation of Glaze's leg.

15

The ulcers were necessarily a result of a "professional incident" as defined in the PULIC policy. That the ultimate injury or damage to Glaze, the amputation of her leg, did not occur during the PULIC policy is of no moment as the PULIC policy does not contain such a limitation.

As to Evanston, it is undisputed that a portion of the alleged malpractice occurred during its policy period. The stage II ulcers were present when the Evanston policy came into force on February 7, 2000. Glaze was admitted to the hospital on February 10, 2000, where she remained until February 18, 2000. Five days later a physician recommended above-the-knee amputation of Glaze's leg as the ulcers were so severe that nothing else could be done to save her leg. The amputation was performed on March 2, 2000. All the above occurred within the Evanston policy.

In summary, the evidence establishes that Glaze's allegations of "professional incidents" (as defined by the PULIC policy) and/or malpractice (as defined by the Evanston policy) spanned a time period from January 25, 2000[12] until her leg was amputated on March 2, 2000. There was no single, defined event which resulted in Glaze's injury and damages. Instead, Glaze's injuries resulted

---

[12] Because of the statute of limitations, Glaze's allegations upon which she could file a lawsuit, date back only to January 25, 2000.

from multiple acts and/or omissions, occurring within the time periods of <u>both</u>

policies, which resulted in the amputation of her leg.  The language of the policies,

the continuing nature of her injury, and that acts and/or omissions occurred within

the coverage periods of both policies necessarily results in the conclusion that

PULIC and Evanston insured the same risk in this case.  <u>See</u> <u>Nationwide Mut. Ins.</u>

<u>Co.</u>, 643 So.2d at 561-62.

     In making this determination, the court rejects PULIC's interpretation of the

language "concurrently liable insurer" in <u>Nationwide</u>.  643 So.2d at 561-62.

PULIC contends that "Evanston's contribution claim fails, as a matter of law,

because the respective policies are not concurrent as required by <u>Nationwide</u>."

(Def. Brief in Support of S.J. at 12.)  Although PULIC correctly quotes the

language in <u>Nationwide</u>, as correctly noted by Evanston, "PULIC misconstrues the

grammar of the sentence."  (Pl. Opp. Br. at 16.)  The word "concurrently" modifies

the adjective "liable" which describes the other "insurer."  Therefore, while the

liability of the insurers must be concurrent, the policies of insurance need not be.

### B.  Apportionment of Liability

     Because the court concludes that PULIC and Evanston insured the same risk

in this case, the court must decide how to apportion the liability for the settlement.

There are three options the court can take when deciding the apportionment issue.

The first two options are proposed by Evanston, and both entail examination of the "other insurance" clauses contained in the PULIC and Evanston policies.  The first option, the one requested by Evanston, would be to read the PULIC policy as the primary policy, thus making PULIC responsible for the entire amount of the settlement.   The second option, the alternative given by Evanston, would be to read the "other insurance" clauses in the policies as mutually repugnant, resulting in contribution in proportion to the policy limits.  The third option, one discouraged by Evanston, would be to allocate the settlement with the "time on the risk" method of apportionment.

As to which option is the correct one, the parties are in the best position to decide how to apportion the settlement.   The court contemplated sending this case, now that the court has made a decision as to liability, to mandatory mediation.  However, this litigation has continued for far too long, and too many costs have been incurred, over and above the amount paid to settle the Glaze lawsuit.  The court, therefore, deems the best course of action as ordering the parties to attempt to apportion the cost of settling the Glaze lawsuit among themselves.  The insurance companies are in a far better position than the court to make such a determination.

18

### V.  Conclusion

In summary, the court finds that no material issues of fact remain as to the liability portion of this case.  Evanston is entitled to judgment as a matter of law on the issue of liability, as the court concludes that PULIC and Evanston insured Southern Home for the same risk.  As to the apportionment of the settlement, the court allow the parties time to attempt to apportion the costs among themselves.

A separate order will be entered.

**DONE** this the ____6th____ day of September, 2007.

_____

SENIOR UNITED STATES DISTRICT JUDGE