FILED
2008 Jan-22 PM 04:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

**EVANSTON INSURANCE CO.,**       )

    **PLAINTIFF,**       )

**VS.**       )       **2:05-cv-743-JHH**

**PROFESSIONAL UNDERWRITERS** )
**LIABILITY INSURANCE CO.,**

        )

    **DEFENDANT.**

**MEMORANDUM OF DECISION**

This case arises out of the settlement of an action ("the Bullock County

lawsuit" or the "Glaze lawsuit") commenced January 25, 2002, with the filing of a

complaint in the Circuit Court of Bullock County, Alabama, against Southern

Springs Healthcare Facility ("Southern Springs" or "the nursing home"), a nursing

home in Bullock County, by a patient of Southern Springs, Mary Glaze, who

developed bedsores that were improperly treated by the nursing home over a

period of months, and which ultimately worsened to such an extent that Glaze's

leg was amputated.  (<u>See</u> Bullock County Compl.)   During the course of

treatment, the nursing home's insurance carrier changed from defendant

Professional Underwriters Liability Insurance Company ("PULIC") to plaintiff

Evanston Insurance Company ("Evanston"). Although both shared the cost of defending the Bullock County lawsuit, only Evanston paid for the settlement of the action by Glaze.

The instant complaint by Evanston seeks reimbursement from PULIC for that settlement. PULIC and Evanston both filed motions for summary judgment, asserting that no genuine issue of material fact exists and that each was entitled to judgment as a matter of law. On September 6, 2007, the court concluded that Evanston was entitled to judgment as a matter of law on the issue of liability because of the court's determination that, although the policies of insurance were consecutive, because of the type of injuries sustained by Glaze and the language of the policies, PULIC and Evanston insured Southern Springs for the same risk in this case. (Doc. #44.) The court, however, did not decide how to apportion the settlement, and instead ordered the parties to attempt to do it themselves, as they were best equipped to decide this issue. (Doc. #45.) Because the negotiations of the parties failed, (see doc. #46), the court ordered briefing on the issue of apportionment, (doc. #47), an issue that the court views as still pending under the summary judgment motion (doc. #31) filed by Evanston. Pursuant to the court's November 8, 2007 order (doc. #47), that portion of Evanston's motion was deemed submitted, without oral argument, on December 14, 2007.

The parties have filed briefs in support of their respective positions.

Evanston submitted a brief (doc. #48) in support of its motion for summary

judgment regarding apportionment on November 21, 2007.  On December 7, 2007,

PULIC submitted a brief (doc. #49) in opposition to Evanston's apportionment

argument.  On December 14, 2007, Evanston filed a brief (doc. #50) in reply to

PULIC's opposition.  All briefs have been considered.

## I.  Standards for Evaluating a Summary Judgment Motion

As more thoroughly detailed in the September 6, 2007 memorandum of

decision, (doc. #44) summary judgment is only appropriate if there is no genuine

issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  It is the

moving party's initial burden to identify evidence which could indicate an absence

of disputed fact issues.  Id. at 323.  Once the non-moving party presents evidence

to show that there are genuine issues for trial, the court must believe this evidence

and draw all inferences in favor of the non-moving party.  Anderson v. Liberty

Lobby, 477 U.S. 242, 255 (1986).  The existence of any material factual dispute on

an issue affecting the outcome of the case can defeat summary judgment.

Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc).

## II.  Relevant Undisputed Facts

The court will not recite the majority of the undisputed facts previously set

forth in the September 6, 2007 memorandum of decision, (doc. #44) and instead

incorporates them herein.  For purposes of the remaining issue left to be

determined, it is enough to recount the following regarding the settlement of the

Glaze lawsuit in Bullock County, Alabama:

> PULIC first received a copy of the complaint on February 4 or 5, 2002.  (Ex. 1 to LaVenia Dep.)  PULIC faxed a copy of the complaint to Evanston on February 13, 2002.  (Id.)  The carriers agreed to evenly split the cost of the defense, and upon the recommendation of Southern Springs and others, retained Hill Sewell of Johnston Barton to defend.  (Id.)

> Both insurance companies began separate evaluations of the complaint.   By late summer 2002, settlement negotiations began between Evanston and Glaze.[1]  (Ex. D to Sewell Decl.) Although advised of the settlement negotiations, PULIC refused to participate because of a mistaken belief that it needed consent of the insured to settle.  (See LaVenia Dep. at 20; Ex. 1 to LaVenia Dep at 63.)  Glaze's attorney demanded $460,000 to settle the case.  (Ex. 1 to LaVenia Dep at TDC67-68.)

> Over the next months, talk continued between Evanston and PULIC regarding settlement.  PULIC continued to refuse because of its mistaken belief that the policy contained an insured's consent clause.  Finally, in May, 2003, Evanston demanded that PULIC participate in the settlement of the claim or Evanston would settle at $460,000 and sue PULIC for contribution.  (Ex. 8 to LaVenia Dep.)  PULIC maintained its position and refused to participate in the settlement for lack of insured consent.  (Ex. 1 to LaVenia Dep. at TDC 7-8.)

---

[1] Apparently Glaze's attorney was not aware of the PULIC policy.  Although plaintiff's brief represents that "[p]rior to the execution of the settlement, [Glaze's attorney] was advised of the PULIC policy" by Evanston, it is unclear when this actually occurred.

Then, on May 12, 2003, PULIC requested consent of Southern
Springs.  On May 16, 2003, Southern Springs expressly gave consent
to settle with Glaze, which was received by PULIC on May 19, 2003.
(Exs. 2,4 to LaVenia Dep; LaVenia Dep. at 36.)  PULIC, however,
did not make any settlement offer, but complained that it had been
shut out of negotiations.  (Ex. 1 to La Venia Dep. at TDC 1, 2.)  After
much back and forth between the insurance companies and attorneys
representing the insurance companies, and with no agreement reached
(see Exs. 1,5 to Lavenia Dep.; Ex. 3 to Johnson Dep.; LaVenia Dep.
at 21), Evanston settled the Glaze lawsuit on May 23, 2003, for
$460,000.  (Ex. D to Sewell Decl.)  As promised, the instant
complaint was filed by Evanston on April 8, 2005, seeking
contribution from PULIC.  (See Compl.)

(Doc. #44 at 11-13.)

### III.  Applicable Substantive Law and Analysis

The basic nature of this case is not unusual: two insurance companies

dispute the liability for the settlement paid on behalf of the insured.  The problem

with this case, however, is twofold: (1) it does not involve a single, defined event,

but involves bedsores that progressively developed and went without proper

treatment over a period of time; and (2) the insurance policies covering the

continuing injuries are consecutive in time, instead of the usual case where the

policies are concurrent.   The court has previously determined that the insurance

companies insured the same risk in this case.  (See doc. #44.)  It is now the court's

unenviable position to decide how to allocate the settlement paid by one of the two

insurance companies.

## A. Three Methods of Apportionment

Evanston provides the court with two alternative methods of apportionment for the settlement it paid to Glaze.  First, Evanston contends that, under Alabama law, the court must look to "the specific policy language [to] provide a solution to the allocation issue" in cases such as this one.  (Doc. #48 at 8.)  Under Evanston's argument, the court should use the "other insurance" clauses, contained in both the PULIC and Evanston policies, to determine the allocation of the settlement. Evanston contends that the "specific policy language . . . provides a clear basis for allocation consistent with settled Alabama law by enforcing PULIC's undertaking to be primary insurer, and enforcing Evanston's limitation of its undertaking to be an excess insurer."  (Id. at 13.)  In other words, Evanston asserts that because PULIC's "other insurance" clause makes it the primary insurer, and Evanston's "other insurance" clause makes it an excess insurer, PULIC must reimburse Evanston for the full amount of the settlement, plus interest.

In the alternative, Evanston argues that if the court finds the "other insurance" clauses are "mutually repugnant," Alabama law mandates that the court allocate the settlement in proportion to the policy limits.  (Id. at 11-13, 17-18.) Such a determination would result in PULIC paying two-thirds of the settlement, plus interest.

PULIC disagrees with Evanston's alternatives and offers a third apportionment option. PULIC contends that the court, "guided by its sense of equity and justice," should apply the time-on-the-risk method of allocation. (Doc. #49 at 12.) PULIC argues that the court should take into consideration the fact "that the policy periods themselves did not overlap, the fact that the nature of the underlying allegation is an omission or failure to act over a number of days, and the ability to make a clear calculation of that allocation." (Id.) According to PULIC's calculations, this method would require PULIC to contribute $89,032.26 to the $460,000 settlement by Evanston. (Id. at 13.)

### B.  Application of the "Other Insurance" Clauses

The court rejects Evanston's contention that Alabama law mandates that the court apply the "other insurance" clauses to allocate the settlement paid by Evanston in the instant case. Upon close examination of the cases cited by Evanston in support of its contention that Alabama law mandates the court to examine only the insurance contracts themselves, one glaring distinction from the instant case emerges: all of the cases cited by Evanston involve concurrent policies. That is, Alabama courts use the "other insurance" clauses to resolve multiple coverage situations where the triggered policies are concurrent, i.e., where the policies share an identity of the insured interest, an identity of the risk,

and an identity of parties <u>at the same time</u>.  <u>See</u>, <u>e.g.</u>, <u>Nationwide Mut. Ins. Co. v.

Hall</u>, 643 So.2d 551 (Ala. 1994); <u>Horace Mann Ins. Co. v. United Intern. Ins. Co.</u>,

762 F.Supp. 1470 (M.D. Ala. 1990); <u>Protective Nat'l Ins. Co. of Omaha v. Bell</u>,

361 So.2d 1058 (Ala. 1978); <u>State Farm Fire & Cas. Co. v. Hartford Acc. &

Indem. Co.</u>, 347 So.2d 389 (Ala. 1977); <u>Georgia Cas. & Sur. Co. v. Universal

Underwriters Ins. Co.</u>, 534 F.2d 1108 (11th Cir. 1976); <u>State Farm Mut. Auto. Ins.

Co. v. Auto-Owners Ins. Co.</u>, 331 So.2d 638 (Ala. 1976); <u>State Farm Mut. Auto.

Ins. Co. v. Auto-Owners Ins. Co.</u>, 252 So.2d 631 (Ala. 1971); <u>United States Fid. &

Guar. Co. v. Dixie Auto Ins. Co.</u>, 292 F.Supp. 554 (M.D. Ala. 1968); <u>State Farm

Mut. Auto. Ins. Co. v. General Mut. Ins. Co.</u>, 210 So.2d 688 (Ala. 1968); <u>see

generally</u> 16 Couch on Insurance 2d §§ 62:93-96, 62:112 (rev. ed. 1983).

That is not the case here.  In this case, the policies are consecutive and do

not overlap in time.  Normally, consecutive insurance policies do not cover the

same risk because those risks are generally discreet incidents.  The court's

conclusion that the consecutive policies in this case covered the same risk was

based upon the unique set of facts presented.  Primarily, these include the

continual nature of Glaze's injuries and the lack of a limitation in the PULIC

policy that the date of injury, damage, manifestation of the injury, or discovery of

the injury occur within the confines of the policy period.  (<u>See</u> doc. #44 at 14-17.)

None of the cases cited by Evanston support the conclusion that Alabama law mandate that the court read the "other insurance" clauses as the means of allocating the settlement in unique cases such as the one presented here.

Additionally, the court has been unable to find any Alabama authority to support the use of the "other insurance" clauses as the allocation device between consecutive insurance policies, such as the PULIC and Evanston policies. In fact, the court has found at least one case (although not from Alabama) which holds exactly the opposite: "such clauses apply only when the coverage is concurrent. Where, as here, the policies periods did not overlap at all, such clauses are not applicable." St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co., 919 F.2d 235, 241 (4th Cir. 1990) (citing North Carolina law where, like in Alabama, "other insurance" clauses are applicable when coverage is concurrent). Where successive policies are triggered by a single continuing occurrence that spans the various policy periods, the situation is different. Although both policies are triggered, they do not both apply to the risk on the same basis because each is in effect for a different policy period. Cf. Couch § 62:112.

The court, therefore, concludes that, under Alabama law, the application of the "other insurance" clauses to apportion the settlement in this case is inapposite because the policies are consecutive, not concurrent. Because Alabama law does

not provide an answer to the allocation problem presented in this case, the court

will look to other federal courts that have addressed this issue in similar contexts.

See Matter of Transystems, Inc., 569 F.2d 1364, 1370 (11th Cir. 1978).

### C.  Time-on-the-Risk

PULIC correctly notes that the time-on-the-risk approach seems to be used

by courts "where the nettlesome problem of apportionment over successive

insurance policies exists."  (Doc. # 49 at 5.)  This method was developed by courts

as an apportionment solution in environmental damage or toxic tort cases, where,

as in this case, "damage - and liability - may be found to span the term of several

policies of insurance."  15 Couch on Insurance 3d § 217:9 (rev. ed. 2007).

Unfortunately, the court has been unable to find a factually analogous case.

The closest case the court could find, a case not cited by either party, is St. Paul

Fire & Marine Ins. Co. v. Vigilant Ins. Co., 919 F.2d 235 (4th Cir. 1990).  In that

case, a psychiatrist had sexual relations with a patient during the term of a

successor insurer's professional liability policy.  Id. at 236-38.  That insurance

company, St. Paul, defended and settled the case and sued the successor insurer,

Vigilant, for contribution.  Id. at 238.  The court determined that because the

sexual relations were made possible by the trust and reliance consequent to the

doctor-patient relationship which began during the prior insurer's professional

liability policy, both insurance companies insured the same risk.  Id. at 240-41.

Among other things, the Fourth Circuit determined that the successor insurance

company, Vigilant, had to contribute to the settlement paid by St. Paul.  Id.

However, because Vigilant breached its duty to defend, the Fourth Circuit rejected

Vigilant's argument that each carrier should be liable for only the injury occurring

during its policy.  Id. at 242 n.8.

The instant case is very similar to the one decided by the Fourth Circuit.

Just as the ultimate manifestation of the injury, the sexual relations, occurred in

the latter insurance policy period, the trust and reliance of the doctor-patient

relationship, which directly led to the sexual relations, occurred during the first

policy period.  Here, although the ultimate manifestation of Glaze's injuries, the

amputation of her leg, occurred during Evanston's policy period, the bed sores

which led to that amputation occurred during the span of both PULIC's and

Evanston's policy periods.  PULIC, however, did not breach its duty to defend,

and both carriers should be liable for damages occurring during their policy

periods.  As consecutive policies, those damages are precisely what the policies

insured.  As such, the court concludes that the peculiar facts presented here

warrant the application of the time-on-the-risk method of apportionment.

*D. Apportionment*

Under the time-on-the-risk method of apportionment, the court must determine the trigger for coverage in each of the policies.  The court previously concluded that "'professional incidents,' as defined by the PULIC policy, occurred during the PULIC policy period which ended on February 7, 2000 at 12:01 a.m." because the ulcers, which ultimately led to the amputation of Glaze's leg were present, and not treated properly, before the expiration of the PULIC policy.  (Doc. # 44 at 15.)   Moreover, the court concluded that "[t]he ulcers were necessarily a result of a 'professional incident' as defined in the PULIC policy."  (Id.)

Normally, when the ulcers became the result of a "professional incident" would be a hotly debated topic.  However, because the statute of limitations in the underlying lawsuit, that issue is not so difficult in this case.  The PULIC policy began on October 15, 1999 and ended on February 7, 2000 at 12:01 a.m.  The underlying complaint alleges that the negligence began on February 1, 2000.  Evanston, however, presented undisputed evidence that the ulcers began before this date.  The undisputed record contains a note by a nurse documenting "an absent pedal pulse of 1/23/00 and an absent popliteal pulse on 1/25/00" without notification to the physician about this condition.  Because the court may consider evidence beyond the allegations of the complaint, (see doc. #44 at 6 n.3) the court

accepted this undisputed evidence as evidence of a "professional incident" as

defined by the PULIC policy.  (See id. at 16.)  Glaze, however, could not have

brought any claims of negligence occurring before January 25, 2000.  Therefore,

the court concludes that any "professional incident" under the PULIC policy

occurred between January 25, 2000, and February 7, 2000, at 12:01 a.m., when the

policy expired, and PULIC is responsible for such incidents regarding the

allocation of the settlement of the Glaze complaint.

As to Evanston, the trigger is clear.  The ulcers were present when its policy

came into force on February 7, 2000, at 12:01 a.m.  Additionally, "Glaze was

admitted to the hospital on February 10, 2000, where she remained until February

18, 2000.  Five days later a physician recommended above-the-knee amputation of

Glaze's leg as the ulcers were so severe that nothing else could be done to save her

leg.  The amputation was performed on March 2, 2000."  (Id. at 15.)  All of the

above occurred during the Evanston policy period, and it is undisputed that the

Evanston policy covered such losses during this period.[2]

Therefore, the total time frame covered by both insurance policies is 38

---

[2] With that said, the court recognizes that it is virtually impossible to apportion separate elements of the damage sustained by Glaze to the separate policy periods.  The court has tried, as best it could, to equitably divide the risk between the insurance companies.

days.[3]  PULIC is responsible for the risk for a total of 13 days, January 25, 2000,

through February 6, 2000.  Evanston is responsible for the remaining 25 days,

February 7, 2000 through March 2, 2000.  PULIC, therefore, must pay 13/38ths of

the $460,000 settlement to Evanston, or $157,368.42.

## IV.  Conclusion

In summary, the court finds that no material issues of fact remain and that,

as a matter of law, Evanston Insurance Company is entitled to $157,368.42 from

PULIC for its portion of the settlement of the Glaze lawsuit.  A separate order will

be entered.

       **DONE** this the ___22nd___ day of January, 2008.


_____
      SENIOR UNITED STATES DISTRICT JUDGE

---

[3] In the year 2000, February had 29 days.